**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

**JOSEPH GRILLO,** *Pro se*

    *Plaintiff,*

    v.

Case No. 1:26−cv−00248−JJM−PAS

**THE RHODE ISLAND BOARD OF**
**MEDICAL LICENSURE AND DISCIPLINE,**

**STACI FISCHER, CHIEF ADMINISTRATOR,**

**RAYMOND MARCACCIO, STAFF ATTORNEY**

    *Defendants,*

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY**</u>
<u>**INJUNCTION**</u>

**TABLE OF CONTENTS**

INTRODUCTION ……………………………………………………………………...6

BACKGROUND …………………………………………………………………….…9

The relevant facts of this case …………………………………….…………….9

"Order and Decision Suspension" discussion …………………………………..8

The false and misleading statements in the suspension document ……………..… …11

Plaintiff's reply to the false and misleading disinformation contained in the suspension document……………………………………………………………………… 12

Plaintiff's request for a meeting with the Physician's Health Program ………………..13

Plaintiff's reply to the Defendant's false claims that Plaintiff either missed breathalyzer tests or was late in performing them ……………………………………………..14

Plaintiff's reply to allegations of "intentional and repeated breaches" ………………..15

Plaintiff's reply to allegations of "unprofessional conduct." ………………………….15

The summary suspension of Dr. Grillo's medical license was unlawful …..................18

At no time was Dr. Grillo an imminent threat to the public …………………………..19

At no time did the Plaintiff "fail to remain compliant" ………………………………19

LEGAL STANDARD ……………………………………………………………….....20

ARGUMENT

The Defendants are not entitled to 11th Amendment immunity …………………..…… 20

The *Ex Parte Young* exception applies specifically to this Motion………………………..21

The Plaintiff is likely to succeed on the merits ……………………………………… 21

The Plaintiff will suffer irreparable harm absent a preliminary injunction………………..22

The balance of equities favors the Plaintiff …………………………………...…..….23

A preliminary injunction favors the public interest …………………………………......23

This Court should waive the requirement that a bond be posted ………………………….24

Formation of the Consent Decree was flawed ........................................................................24

In forming the Consent Decree, were there negotiations?.....................................................26

The Federal Rules of Civil Procedure, FRCP Rule 60. Relief from a Judgment or Order …...26

Justification for modifying the Plaintiff's medical license ...………………………………....27

The Plaintiff continues to not be treated equally compared to similarly situated individuals...28

The BMLD's rationale for imposing a ten-year probation was irrational,
arbitrary and capricious. …………………………………………………………………… …...28

What are some of the harms suffered by the Plaintiff? ……………………………… …….29


CONCLUSION …………………………………………………………………….31

## TABLE OF AUTHORITIES

### Cases

*E.M.B. Assocs. v. Sugarman*, 372 A.2d 508, 509 (1977). …………………………………17

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
121 F.4th 339, 347 (1st Cir. 2024) …………………………………………………………17

*Ryan v. U.S. Immigration and Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020))……………..17

*Winter v. Natural Res. Defense Council, Inc*., 555 U.S. 7, 20 (2008) ……………………..18

*Pawtucket Teachers' Alliance, Local 920, AFT, AFL-CIO v. Brady*,
A.2d 557 (R.I. 1989 …………………………………………………………………… 18

*Jean v. Mass. State Police*, 492 F.3d 24, 26–27 (1st Cir. 2007) ……………………………18

*Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 162 (1st Cir. 2004) ….. 18

*Ex Parte Young*, 209 U.S. 123 (1908) ……………………………………………………18

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) …………………………18

*Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) ……………………..18

*Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ………20

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) ……………20

*K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989) ………………..20

*Biogen Idec MA Inc. v. Trustees of Columbia Univ.*,
332 F. Supp. 2d 286, 296 (D. Mass. 2004) ……………………………………………………20

*New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. 2025) …………………………... 21

*Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) ………………………………21

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), aff'd, 463 F.3d 50 (1st Cir. 2006). ………………………………………………21

 *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) …………...21

*Nat'l Insts. of Health*, 2025 WL 702163 …………………………………………………21

*Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ……………………………..21

*Crowley v Furniture & Piano Moving, Furniture Store Drivers, etc., Local No. 82*, 679 F.2d 978, 1000 (1st Cir. 1982). …………………………………………………………………21

**Statute**

R.I. Gen. Laws § 5-37-5.1(24) …………………………………………………………….15

R.I. Gen. Laws § 5-37-8 (2024) …………………………………………………………...18, 21

5 U.S.C. § 706(2)(A)–(C) ……………………………………………………………………22

**Rule**

Fed. R. Civ. P. 11 ……………………………………………………………………… 21

Fed. R. Civ. P. 65(b) ………………………………………………………………… 24

Fed. R. Civ. P. (60) ………………………………………………………………… 26

Fed. R. Civ. P. 60(c)(1)…………………………………………………………………… 26

Fed. R. Civ. P. 60(b)(6) ……………………………………………………………… 27

## Other Authorities

Black's Law Dictionary, 1416, (2nd Ed. 2022) …………………………………………..13

Wright & Miller, *Federal Practice and Procedure* § 2948 at 465 (1973) ………………..20

Model Rules of Prof'l Conduct R. 3.3 (2020) ……………………………………………21

ABA Formal Opinion 513 (2024) …………………………………………………………...21

Beresford, T., Wongngamnit, N., Temple, B. *Handbook of Clinical Neurology,
Ch 1 - Alcoholism: diagnosis, prognosis, epidemiology, and burden of the disease*,
Volume 125, 2014, Pages 3-13. …………… ………………………………………..……. 26, 29

White, W. & Kurtz, E. (2006). The varieties of recovery experience.

International Journal of Self Help and Self Care, 3(1-2), 21-61. Posted at
https://www.chestnut.org/Resources/a13cfc89-7920-43bf-b043-af7078aab8c7/2006- The-
Varieties-of-Recovery-Experience-1.pdf ………………… ………………………………….. 29

Vaillant GE, Hiller-Sturmhöfel S. *The Natural History of Alcoholism*. Alcohol Health Res World.
1996;20(3):152-161. PMID: 31798117; PMCID: PMC6876506 …… ……………………..29

Nathan & Skinstad, 1987; "*Outcomes of treatment for alcohol problems:
Current methods, problems, and results*." Journal of Consulting and Clinical Psychology,
55(3), 332–340. https://doi.org/10.1037/0022-006X.55.3.332 ................................................29

De Soto CB, O'Donnell WE, De Soto JL. *Long-term recovery in alcoholics*.
Alcohol Clin Exp Res. 1989 Oct;13(5):693-7.
doi: 10.1111/j.1530-0277.1989.tb00406.x. PMID: 2688470. …………………………….29

Dawson DA. *Correlates of past-year status among treated and untreated persons with former
alcohol dependence: United States*, 1992. Alcohol Clin Exp Res. 1996 Jun;20(4):771-9. doi:
10.1111/j.1530-0277.1996.tb01685.x. PMID: 8800398……………………………………  29

Jin H, Rourke SB, Patterson TL, Taylor MJ, Grant I. *Predictors of relapse in long-term abstinent
alcoholics*. J Stud Alcohol. 1998 Nov;59(6):640-6. doi: 10.15288/jsa.1998.59.640. PMID:
9811085……………………………………………………………………………………..29

**INTRODUCTION**

At times, medical licensure boards are required to take action against a physician. For varying reasons, the physician may pose a risk to the public. After all, licensure boards are charged with protecting the public.

<u>This is not what happened in this case</u>.

The Plaintiff is Dr. Joe Grillo. He is a 68-year-old recovering alcoholic with over eleven years of continuous and documented sobriety. At the time of the summary suspension and for two years prior, he was employed at an urgent care center. He enjoyed the benefits of long-term recovery. He was immersed in his work, family and his recovery. He was a recent law school graduate who had passed the Bar exam. Years of rebuilding his reputation paid off. In short order, his career abruptly ended, and his hard-earned reputation was ruined at the hands of the Defendants, and all of them.

What makes these events poignant is that Dr. Grillo had done absolutely nothing wrong, questionable, or out of the ordinary. His was a long-term, continuous and documented sobriety.

The facts of this case are straightforward. Much of the evidence is presently at hand, is sufficient to support a preliminary injunction, and will be presented.

Defendant Staci Fischer is the Chief Administrator of the Rhode Island Board of Licensure and Discipline (herein the BMLD), and Dr. Steven Carreras of the Physician's Health Program (herein the PHP).[1] Both had recently replaced their previous administration. As such they were unknown entities.

Without justification, the Defendants, and all of them, intentionally operated outside of the law when they issued a summary suspension that they knew was unlawful. This unlawful action

---

[1] The PHP (including Dr. Carreras) are not parties to the instant case, but their involvement is relevant. (*See* Compl. Exhibit A).

was compounded by further illicit acts. They knowingly incorporated false information into the associated legal documents.[2]

This disinformation contained in the two documents formed the framework for the already unlawful summary suspension. This isn't about one mistake. It is about nearly one-hundred individual falsities contained in both documents. Even though the Defendants were fully aware of the falsities, it didn't matter to them. The facts of this case demonstrate a pattern of conduct showing a reckless disregard for established legal, ethical and moral standards. The harms to the Plaintiff continue. They are directly attributed to the actions carried out by the Defendants, and all of them.[3]

Unequivocal, clear, detailed and credible evidence of the falsities was provided to the Defendants, which they ignored. On multiple occasions, they were asked to please mitigate their errors but refused to do so. To them, Dr. Grillo was invisible.

Defendant Marcaccio's demeanor was straight spoken but curst, while Defendant Fischer's was surly and discourteous. Defendant Marcaccio was the spokesperson. Both were fully aware that Dr. Grillo had done nothing wrong but chose to wrongfully harm him rather than do the right thing. Correcting their errors would have been very easy to do – perhaps no more than a few pen strokes. It would have changed the trajectory of Dr. Grillo's life. Yet their arrogance was controlling. They would not lift a finger to help.

<u>Are the Defendants above the law? If not, who or what institutions hold them accountable for illegal and unethical actions?</u>

Both Defendants conducted themselves as though their power and prestige engendered the right to act unconscionably. Here, their hubris gave way to the belief of being above the law. The

---

[2] Both documents are published on the BMLD's public website, and are available to interested parties (i.e., potential employers). They include the Consent Order (dated 1/7/25) and the "Order and Decision for Suspension" (herein referred to as "the suspension document") (dated 8/21/24).

[3] The harms to the Plaintiff are due the combined effect of the summary suspension and the publication of two libelous documents on the BMLD's public website. Potential employers typically review the website prior to hiring a physician.

Defendants have a duty of candor (i.e., the avoidance of deliberate falsehoods). They violated this duty when they intentionally endorsed untruths.

Defendant Marcaccio is articulate, well-spoken and respected, as if he has governors and senators on speed dial. His aesthetic was immaculate, signifying high status. He wore a wealthy coat of tan, and a trimmed haircut. He wore a suit that probably cost more than most people make in months - custom tailored charcoal gray with a subtle pinstripe. The fabric had that sheen that only comes from the most expensive materials. His shirt was crisp white, and his shoes polished to a mirror shine. His belt matched perfectly. Everything about him screamed prestige, but more than that, it screamed entitlement. But make no mistake. He is an enigma. The facts are clear and unambiguous. He and Defendant Fischer knowingly crossed the line into unlawful and possibly criminal conduct. They likely thought it would be easy to bully a 68-year-old man; that that he would offer little resistance.[4] Even if there were some resistance, Defendant Marcaccio likely reasoned that his judicial position would buy him absolute (quasi-judicial) immunity, while Defendant Fischer was confident in her qualified immunity.

Prior to the summary suspension, and even thereafter, the Defendants made no attempt to review or verify the evidence that they incorporated into the aforementioned documents. Instead, they "cut and pasted" unvetted and false information into the documents. This amounts to intentional misrepresentation.

<u>The events described herein really happened – to a tee</u>.

They were entirely unprovoked and unnecessary. They should not have happened. Alternatively, they could have been mitigated with minimal effort.

As to the summary suspension, the Defendants announced their plan to seek permanent revocation of Dr. Grillo's medical license. Directly prior to the Administrative Hearing, the

---

[4] Why was Defendant Marcaccio willing to inflict such severe harms upon the Plaintiff? The Plaintiff is older and appeared vulnerable and defenseless. People like him typically have little recourse. They don't have the resources or knowledge to fight back. They are easy to abuse. Defendant Marcaccio is well aware of this. Even so, his conduct was extreme and well outside the lines of being legal and ethical. In this situation, **he could get away with atrocious acts without even the slightest of stains to his pristine reputation**.

Defendants changed course and announced they would reinstate the Plaintiff's medical license. In all likelihood, they reasoned that their case against the Plaintiff would not survive the Administrative Hearing.

Hence, the Defendant's went from one extreme to another - permanent revocation to reinstatement, all in a short period. Yet they continued to refuse to remove the false information from the aforementioned published documents.

One way or another, the Defendants conspired to accomplish their objective of removing Dr. Grillo from the practice of medicine.[5] Even if the Plaintiff's medical license was not revoked, their combined unlawful acts forced Dr. Grillo into retirement. This is discussed *infra*.

The Plaintiff now has no other option than to respectfully ask this Court for justice.

<u>Intentional misrepresentation - the use of disinformation</u>.

The Defendants were more than willing to compromise the truth to harm an innocent person. This speaks to their character. The events described herein bring into question whether the Defendants are suited to their positions.

The Defendants thought they owned people, that their status gave them the right to act corruptly. When it comes to corruption and intimidation, both the book and the heart say the same thing. Stand your ground. "*You show me bullies, and I'll show you cowards*."

The Court is respectfully requested to grant a preliminary injunction to preserve the status quo so that the harms to Dr. Grillo are halted. That modest relief will ensure this case is given a fair chance to be adjudicated on the merits, while also affording Dr. Grillo the opportunity to return to the practice of medicine, thus partially mitigating the economic harms to him.

---

[5] Potential employers review the BMLD's public website. Given the summary suspension and the presence of the two documents discussed herein, Dr. Grillo was placed in a negative and false light, thus eliminating any opportunity for him to find employment.

**BACKGROUND**

<u>What are the relevant facts and who are the involved parties?</u>

<u>The following matters are discussed herein:</u>

a.  In August 2024, the BMLD summarily suspended Dr. Grillo's medical license. Doing so was unlawful. (*See* Compl. at 3, ¶1)

b.  Shortly thereafter, the BMLD reversed course and reinstated Dr. Grillo's medical license, but not before threatening him with permanent revocation. (*See Infra* at 19, ¶ 6).[6] Even though it was short lived, Plaintiff Grillo suffered significant damages as a result of the unlawful summary suspension.

c.  Next, there are two documents authored by the Defendants and published on their public website in support of the summary suspension: an "Order and Decision for Suspension" document (herein referred to as the "suspension document"), and Consent Order. *See* EXHIBIT A and EXHIBIT B.

<u>The Order and Decision for Suspension (the "Suspension document").[7]</u>
*Ratified on August 21, 2024, by Jerome Larkin, MD (Director of the RI Department of Health)*

Dr. Grillo fully understands the PHP's influence over his career. When dealing with the PHP, Dr. Grillo was always cautious. He acted professionally, was courteous and steered clear of conflicts. Dr. Grillo continued to exercise the same guarded approach with the new PHP administration as with the previous administration. Dr. Grillo knew that any perceived behavioral breach could be career limiting.

---

[6] It remains unclear why the BMLD went from seeking permanent revocation of Dr. Grillo's medical license, to reinstating his medical license within weeks.

[7] To ensure efficiency, this memorandum will only address the facts and evidence pertaining to the suspension document; however, both the consent order and suspension document will be scrutinized at trial. The falsities contained in the consent order are the same or similar to those contained in the suspension document.

Dr. Grillo, knowing the risks, would comply with just about any order. HE WOULD NOT AND DID NOT REFUSE ANY OF THE ORDERS FROM THE PHP.

Being new to the position, Dr. Carreras made some errors. Dr. Grillo was aware of them but chose to remain silent and to comply with his orders. First, Dr. Carreras misinterpreted the initial false positive breathalyzer (on June 13, 2024). Seven days later, he ordered the Plaintiff to submit to a blood PEth test, a test which was incapable of proving abstinence.

Even so, Dr. Grillo took the day off from work and presented to the lab. He would eventually be turned away. There were problems with the orders that could have been corrected with a verbal order from Dr. Carreras, but he was unavailable. *This same process was repeated three more times*. Dr. Grillo would do all at his command to comply with lab orders issued by the PHP; however, it became increasingly onerous since his employer lacked physician coverage during the missed hours. Dr. Grillo risked alienating his employer. Eventually, after submitting to multiple tests (that failed), providing multiple blood specimens, and missing multiple days of work, Dr. Grillo requested a meeting. This was a straightforward request. It was not unreasonable. Instead, Dr. Grillo was abruptly discharged from the PHP.

A summary of the allegations made by the BMLD that were included in the suspension document include the following:

1. Within the suspension document the Defendants make claims of Dr. Grillo's "*repeated intentional breaches*" and being "*non-compliant.*" These claims are false. They are intentional disinformation. As discussed herein, Dr. Grillo went above and beyond what is considered reasonable. He did everything possible to submit to Dr. Carreras' orders. This is further discussed *infra*.

2. The Defendants alleged that Dr. Grillo missed or was late with Soberlink breathalyzer tests (discussed *infra)*. The data directly from Soberlink is provided *infra*. The data shows that the Defendant's allegations are false.

3. On multiple occasions, the Defendants allege Dr. Grillo exhibited "*unprofessional conduct.*" Unprofessional conduct is in part, a subjective term. Even so, Dr. Grillo's

behavior and conduct could not possibly be construed as being unprofessional (discussed *infra*).

<u>False and misleading statements contained in the suspension document.</u>

The following are excerpts from the suspension document containing false and misleading statements.

1. "The Rhode Island Board of Medical Licensure and Discipline (the Board) hereby suspends the probationary license of Joseph Grillo MD ("Respondent") to practice medicine in the state of Rhode Island ***due to his repeated and intentional violations of the express terms of a Consent Order entered*** and ratified by the Board on March 11, 2020." *See* EXHIBIT A at 1, ¶1.

2. ***Respondent refused to comply with the testing requirements*** set forth by the Physician Health Program and has been removed from the monitoring program in violation of the terms of the aforesaid Consent Order. *See* EXHIBIT A at 1, ¶1.

3. On June 17, 2024, RI-PHP received notification from Sober Link of a positive breathalyzer test result from a test conducted on June 13. Because more than 72 hours had elapsed, rendering confirmatory urine testing inappropriate, a Phosphatidyl ethanol (PEth) test was scheduled for June 20 and then later changed to June 24. ***Respondent did not appear for the test on June 24***. *See* EXHIBIT A at 4, ¶6.

4. Despite the clear instructions provided by RI-PHP, ***Respondent refused to appear for the fingernail test***. *See* EXHIBIT A at 5, ¶3.

5. ***When Respondent refused*** [testing] … *See* EXHIBIT A at 5, ¶4.

6. ***Despite the admonitions by RI-PHP, Respondent remained non-compliant with RI-PHP instructions and refused to appear for the fingernail test.*** *See* EXHIBIT A at 5, ¶5.

7. ***As a result of Respondent's non-compliance*** with the express requirements of the RI-PHP monitoring program … *See* EXHIBIT A at 6, ¶4.

<u>Plaintiff's reply to the false and misleading disinformation contained in the suspension document.</u>

<u>The Defendant's use of "non-compliant" and "refused" is inflammatory, inaccurate and inappropriate.</u>

The words "non-compliant" and "refused" are considered stigmatizing and inflammatory. They are viewed at judgmental terms. Next, they mischaracterize the events at hand. In other words, they are false disinformation. To be clear, **AT NO TIME DID DR. GRILLO REFUSE TO UNDERGO ANY TESTING.** The Defendant's statements *supra* were made repeatedly and are false. If Dr. Grillo refused testing (which is not the case), the Defendants should be able to provide evidence to support their allegations.

"Refusal" is a volatile word. Refusal is the positive, intentional, and express declination of a request, demand, or legal duty. It signifies a conscious, willful choice not to comply. *See* Black's Law Dictionary, 1416, (2nd Ed. 2022). At no time did this apply to Dr. Grillo.

Defendant Marcaccio also uses the phrase "*intentional violations ….*" There were NO VIOLATIONS on the part of Plaintiff Grillo. Defendant Marcaccio's use of the adjective "intentional" has no basis, is a fabrication, and is otherwise perverse. Again, should any of their claims have merit, the Defendants should provide the evidence to support their allegations.

At all times, Dr. Grillo was fully compliant with the multitude of orders for PEth testing. This is a matter of record. *Dr. Grillo did all at his command to complete the blood PEth tests* [emphasis added]. After four attempts to comply and being turned away at the lab due to issues with the orders, and after a failed home blood PEth test, Dr. Grillo requested a meeting (or discussion) (*see infra*). There was no response by the PHP, nor were there "*admonitions.*" Instead, Dr. Grillo was discharged from the PHP.

<u>After repeated failures to complete the tests that were ordered by the PHP, Dr. Grillo requested a meeting and/or discussion.</u>

Dr. Grillo emailed Dr. Kerzer on July 23, 2024.[8] The purpose of the email was to request a meeting and/or discussion.  Dr. Grillo was hoping to find a way forward – to lay the matter to rest. The evidence is clear; Dr. Grillo submitted to PEth testing, even though he knew that the test could not prove abstinence. The requested meeting never happened.

---

[8]  Martin Kerzer, DO, is the Chairperson for the Physician's Health Program (PHP). The PHP is part of the Rhode Island Medical Society. Dr. Kerzer and Dr. Carreras are both relatively new to their positions at the PHP.

The following excerpt is taken from the email sent by Dr. Grillo to Dr. Kerzer on Tuesday, July 23, 2024. Again, the purpose was to arrange for a meeting or discussion between the PHP and Dr. Grillo. (*See* EXHIBIT C at 5, ¶5). Clearly, this could not be construed as a refusal to test. It was a request for clarification.

*"For now, I am respectfully temporarily deferring on further tests ... until such time that certain issues are addressed (i.e., a brief discussion) .... Please do not view this as anything other than the need to gain clarity prior to submitting to further testing [emphasis added]."*[9]
Excerpt from email sent by Dr. Grillo to Dr. Kerzer on Tue, July 23, 2024.

<u>Proof that Dr. Grillo, on multiple occasions, attempted to complete the testing.</u>

Each time, after being turned away at Concerta lab, Dr. Carreras would write long and nonsensical documents where he would attempt to explain each of the failures. Dr. Carreras references and documents each time Dr. Grillo presented to the lab, and therefore they serve the purpose of proving the Plaintiff's assertions that he made multiple visits to Concerta lab. These writings are attached as EXHIBIT D.

<u>Reply to the Defendant's false claims that Plaintiff either missed breathalyzer tests or was late in performing them</u>.

The following are excerpts taken from the suspension document.

**"In addition to the noncompliance with the RI-PHP requests, Respondent also missed numerous breathalyzer tests scheduled in June and July of 2024, including various times on June 20, 24, and July 1, 8, 9, 26, 27 and 31."**

---

[9] For reference, a few of the issues that Dr. Grillo wanted to discuss: 1) clarification on what tests am he responsible to complete. At the time that the fingernail test was ordered, there was a PEth test completed, and the results were pending. 2) why did a week pass after the false positive result, before Dr. Grillo was notified that further PEth testing was required. 3) neither a blood PEth test nor fingernail test is capable of provided proof of abstinence. 4) After the false positive, Dr. Grillo followed the Soberlink protocol. His follow up breathalyzer test (completed shortly after the false positive) produced a BAC of zero. Why was this not sufficient to lay this matter to rest? 5) If it was not sufficient, what is your standard of proof? 6) Why was Dr. Grillo's Soberlink testing schedule abruptly changed, and 7.) without informing Dr. Grillo of the change?

*"Respondent was also late in performing breathalyzer tests scheduled at various times on June 14 and 26, and July 3, 13, 15, 16, 20, 22, 23."*

*In total, during the months of June and July 2024, Respondent missed 9 scheduled breathalyzer tests and was late in performing 16 additional breathalyzer tests*. *See* EXHIBIT A at 6, ¶1-3.

<u>Plaintiff's reply to the BMLD's false claims of missed/late tests.</u>

EXHIBIT E is the breathalyzer data provided by Soberlink (the manufacturer of the breathalyzer devise) and is a true and accurate record. The data shows test results corresponding to the alleged missed and late tests averred by the Defendants.

The data shows that: 1.) The Plaintiff did not miss nine tests nor were there sixteen late tests, 2.) The actual data shows three missed tests and zero late tests. 3.) As to the three missed tests, in early July, the Plaintiff's test schedule was changed. This was done without informing the Plaintiff. 4.) He should not be held responsible for tests that he was unaware of.

<u>The Defendants falsely alleged "unprofessional conduct" and "repeated, intentional breaches."</u>

The following are excerpts taken from the Suspension Document.

*The failure by Respondent to remain compliant with the terms of the March 11, 2020 Consent Order, and his termination from the RI-PHP program, constitutes unprofessional conduct*, in violation of R.I. Gen. Laws §5-37- 5.1(24). *See* EXHIBIT A at 6, ¶4.

After considering the above findings, I have determined that *the Respondent intentionally and repeatedly breached the terms of the March 11, 2020 Consent Order* and is now in violation of his probationary status with his license. *See* EXHIBIT A at 7, ¶2.

<u>Plaintiff's reply to allegations of "intentional and repeated breaches."</u>

Even though it is not directly mentioned, based on other writings by the Defendants, the assumption is that Dr. Grillo is alleged to have missed and/or refused testing. This has been addressed *supra*. The facts demonstrate that "intentional and repeated breaches" never occurred. The use of the word "intentional" is inappropriate and false.

<u>Plaintiff's reply to allegations of "unprofessional conduct."</u>

The statements alleging unprofessional conduct appear repeatedly in the BMLD's documents. They misrepresent the concepts of "non-compliance" and "unprofessional conduct." A list of acts that constitute unprofessional conduct are provided in R.I. Gen. Laws § 5-37-5.1(24).

*"Unprofessional conduct. The term "unprofessional conduct" … includes, but is not limited to, the following items…."* R.I. Gen. Laws § 5-37-5.1.

The wording suggests that, within the statute, the list of unprofessional acts is not necessarily complete. The list can; however, be used to compare Dr. Grillo's actions and assess whether he acted unprofessionally.

Unprofessional conduct is an intentional act requiring a deliberate and purposeful mindset. It is performed consciously, deliberately and of free will. Non-compliance resulting in unprofessional conduct implies a failure to perform an obligation (i.e., terms of the consent order) or other such breaches (i.e., nonfeasance).

Unprofessional conduct could not be attributed to Dr. Grillo, because he did absolutely nothing wrong, questionable, unethical or otherwise problematic. Again, he made every attempt to comply with the PHP's orders.

**Being released from the PHP for valid reasons is <u>entirely different</u> when compared to being removed; a) against the Plaintiff's will, b) without justification, c) based on disinformation, d) after going out of his way to be cooperative, and e) not having an opportunity to defend himself.**

Dr. Grillo's actions were above and beyond what would be considered reasonable. Even though it was readily apparent that the PHP misread the false positive breathalyzer test, Dr. Grillo willingly submitted to blood PEth testing, even though he knew it was not capable of

proving abstinence.[10,11] Dr. Grillo took the days out of work. He presented to Concerta lab repeatedly. He provided multiple blood samples. He then completed a home PEth test.

Additional exculpatory facts are summarized as follows.

- At the time of the suspension, Dr. Grillo had achieved long-term sobriety and continued to be monitored by multiple members of his treatment team, including a psychiatrist and an addiction medicine physician. At all times, he continued to use the Soberlink breathalyzer. Needless to say, all tests were negative (i.e., a blood alcohol content of zero).

- Prior to the summary suspension, the BMLD was made aware of this and other relevant facts.

- In fact, Dr. Grillo's treatment team had been continuously monitoring him from day one. They received the same Soberlink test results as the PHP.

- There were no issues or problems with Dr. Grillo's employment. Over the recent past, he received positive performance reviews from his employer including two salary increases and multiple bonuses.

---

[10] PEth testing could not answer the question at hand (was there a "one-up" of alcohol consumption). The reason is that a "negative" test is one that falls at or below 20 ng/ml, the interpretation of which is: either no alcohol consumption or light alcohol consumption. It is not capable of proving abstinence and should not be used to confirm abstinence.

*See* Stöth F., Kotzerke E., Thierauf-Emberger A., Wolfgang W., Schuldis D. (2023) Can PEth be detected with a Cutoff of 20 ng/mL after single alcohol consumption? Journal of Analytical Toxicology, 46, e232–e238.

*See also* Aboutara N., Jungen H., Szewczyk A., Müller A., Iwersen-Bergmann S. (2023) PEth 16:0/18:1 and 16:0/18:2 after consumption of low doses of alcohol-A contribution to cutoff discussion. Drug Testing and Analysis 15, 104–114.

*See also* Isaksson A, Walther L, Hansson T, et al. Phosphatidyl ethanol in blood (B-PEth): a marker for alcohol use and abuse. Drug Test Anal. 2011;3(4):195-200.

[11] Dr. Grillo was first contacted by the PHP (where they demanded a blood PEth test) seven days after the false positive breathalyzer. At the seven-day point, there are no tests available that can prove abstinence following a "one-up" drinking event.

- Dr. Grillo continued to thrive in long-term recovery. He was fully engaged with work and family. He remained entrenched in the recovery community and continued to attend five or more meetings per week.

- Of note is the previous administration of the PHP were ardent supporters of Dr. Grillo. They often expressed pride in assisting his return to good health.

- To reiterate, there are no facts that would suggest that Dr. Grillo exhibited unprofessional conduct or posed an immediate (or long-term) danger to the public.

- Even though the events and circumstances were difficult, Dr. Grillo did everything at his command to comply with the PHP's multiple orders. The orders came non-stop (a total of eight).

- To reiterate, Dr. Grillo made FIVE GOOD FAITH ATTEMPTS at complying with their demands. He provided multiple blood specimens. There was nothing more that he could have done. Finally, there was no place for him to turn for advice and/or assistance.

- Most likely, the legal doctrine of impossibility applies here.

<u>The August 2024 summary suspension of Dr. Grillo's medical license was unlawful.</u>

A summary suspension is an extreme remedy. R.I. Gen. Laws § 5-37-8 (2024) is clear. [12] It provides limits on the BMLD's powers.

The statute is unambiguous. It is clear and specific, leaving no room for interpretation. It is applied according to its literal meaning (i.e., "plain meaning rule"). A summary suspension is

---

[12] *"The director may temporarily suspend the license of a physician or limited registrant **without a hearing if the director finds that evidence in his or her possession indicates that a physician's ... continuation in practice would constitute an immediate danger to the public** [emphasis added]."* R.I. Gen. Laws § 5-37-8 (2024).

ONLY appropriate where the physician poses an immediate risk to the public. Furthermore, the Defendants may exercise only that authority which is conferred by statute.

<u>Defendant Marcaccio's "rubber stamp" justice.</u>

The factual framework for the summary suspension was unequivocally false. This was known by the Defendants, but they used the false information anyway. Next, the false information was provided by the PHP to the BMLD. The BMLD, namely Defendant Marcaccio never lifted a finger to scrutinize or otherwise verify the information. Instead, he "cut and pasted" the information from PHP and into the aforementioned documents. Finally, even if each and every false fact were true (which is not the case), it would not be adequate to justify a summary suspension.

<u>At no time was Dr. Grillo an imminent threat to the public</u>.

Dr. Grillo did nothing but show up for work. He practiced competently and did his utmost to treat patients with dignity and respect. There were no complaints by patients or his employer. He received two salary increases and multiple bonuses. He has never been accused of incompetence, nor has he ever been sued for malpractice. He maintained board certification in internal medicine.

As stated herein, even after being discharged from the PHP, he continued to be monitored by his treatment team using the same protocol as previous. The BMLD was aware of this. Dr. Grillo continued to maintain continuous and documented sobriety.

As stated herein, the Plaintiff's made every possible effort to comply with each and every demand made by the PHP. (*See* Compl. Exhibit A).

Prior to the summary suspension, Dr. Grillo requested that the BMLD permit him to submit additional documentary evidence, but his request was disregarded. Instead, his medical license was abruptly, and without cause suspended.

<u>At no time did the Plaintiff "fail to remain compliant"</u>.

The suspension document and consent order both contain this (and similar) language:

*"The failure by Respondent to remain compliant with the terms of the March 11, 2020 Consent Order, and his termination from the RI-PHP program, constitutes unprofessional conduct, in violation of R.I. Gen. Laws § 5- 37-5.1(24)." See* EXHIBIT A at 6, ¶6.

Non-compliance resulting in unprofessional conduct implies a failure to perform an obligation (i.e., terms of the consent order) or other such breaches (i.e., nonfeasance). A violation involves a willful failure to comply. The evidence is clear – Dr. Grillo's conduct was never unprofessional, nor was he non-compliant. In fact, the opposite is true.

**<u>LEGAL STANDARD</u>**

The standard for preliminary injunctive relief has long been established. Most significantly, the primary function of an injunction is to either preserve or restore the status quo. *See E.M.B. Assocs. v. Sugarman*, 372 A.2d 508, 509 (1977) ("a [preliminary injunction] is meant to preserve or restore the status quo and that this status quo is the last peaceable status prior to the controversy.") (citing Wright & Miller, *Federal Practice and Procedure* § 2948 at 465 (1973).

Accordingly, "[i]n determining whether to issue an injunction, a trial justice should consider four factors: (1) whether the plaintiff has a reasonable likelihood of success on the merits of the case, (2) whether the plaintiff will suffer irreparable harm if the injunction is denied, (3) the balance of equities favors the movant, and (4) the injunction favors the public interest." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quoting *Ryan v. U.S. Immigration and Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)); *see Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). *See also Pawtucket Teachers' Alliance, Local 920, AFT, AFL-CIO v. Brady*, A.2d 557 (R.I. 1989).

To demonstrate likelihood of success on the merits, plaintiffs must show a "reasonable likelihood" that they will prevail. *Jean v. Mass. State Police*, 492 F.3d 24, 26–27 (1st Cir. 2007). A movant can establish the existence of "irreparable harm" by demonstrating that it likely has "no adequate remedy at law." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

**ARGUMENT**

The Defendants are not entitled to 11th Amendment immunity.

As explained elsewhere, the Defendants, and all of them, are not entitled to immunity. (*See* Compl. at 43). Further, the *Ex parte Young[13]* exception applies specifically to this Motion. It allows private parties to sue state officials in federal court for prospective injunctive relief to stop ongoing violations of federal law or the U.S. Constitution. It bypasses Eleventh Amendment sovereign immunity by treating the official as acting in their individual capacity, not the state's. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). The *Ex parte Young* exception to sovereign immunity applies whenever a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002).

The evidence substantiates the likelihood of a successful claim. The Defendant's actions continue to violate federal laws and the Constitution.

The Defendants issued an unlawful summary suspension, in which the Defendants acted *ultra vires*. The language of the statute governing this action (*see* R.I. Gen. Laws § 5-37-8 (2024)) is clear and unambiguous. The Defendants could not possibly allege that Dr. Grillo posed an imminent threat to the public. The Defendants were aware of this as well as their illegal acts. The factual basis for the summary suspension, as described in the aforementioned published documents was largely false. This too was known by the Defendants. Even so, the false information provides the framework for their unlawful summary suspension. Even though the Defendants have a legal duty to vet the information used in their documents, which they did not do. Instead, they cut and pasted the falsities into the two documents.[14] Finally, the Defendants were, on multiple occasions, requested to remove the offending materials. They refused to do so. The evidence is overwhelming.

The Plaintiff has established a strong likelihood of success on the merits.

---

[13] 209 U.S. 123 (1908)

[14] Attorneys have a strict ethical and legal duty to vet evidence, governed by court rules regarding competence, candor to the court, and the prohibition of submitting falsified evidence. A lawyer cannot act as a "rubber stamp" for a client or opposing party and must take reasonable steps to verify the legitimacy of claims and materials. Model Rules of Prof'l Conduct R. 3.3 (2020); ABA Formal Opinion 513 (2024); Fed. R. Civ. P. 11.

The BMLD's actions and rulings are unlawful on numerous grounds, but, given the urgency and to conserve judicial resources, this motion focuses on a subset of Plaintiffs' claims, any one of which would justify the Preliminary Injunction that the Plaintiff seeks.

The Plaintiff is likely to succeed on his claims that the BMLD's rulings must be set aside as "in excess of statutory, jurisdiction, authority, or limitations," "not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(C).

The evidence presented is unequivocal. It demonstrates that:

a. The Defendants knowingly issued an unlawful summary suspension,

b. The framework for summary suspension, as presented in their "Order and Decision for Suspension" document and Consent Order, contained nearly one-hundred instances of knowingly false facts and conclusory statements.

c. The BMLD published to their public website the above-mentioned two documents, where they remain published to this day.

d. The foundational evidence used to support both documents was largely false. The BMLD made no effort to confirm or investigate the veracity of the evidence.

e. The BMLD "cut and pasted" and "rubber stamped" the false information into the two aforementioned documents.

f. On multiple occasions, the Plaintiff requested that the BMLD mitigate the harms they caused. The BMLD refused his request.

The Defendants will not be able to offer either a defense to these allegations, nor will they be able to adequately mitigate them.

<u>The Plaintiff will suffer irreparable harm absent a preliminary injunction.</u>

The Court should enter an injunction because without one, the Plaintiff will "suffer harms that are not accurately measurable or adequately compensable by money damages." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989) (internal quotations omitted)).

Plaintiff Grillo continues to be harmed by the Plaintiff's actions. Many of the harms have already occurred, and absent entry of an injunction, will continue. Where, as here, irreparable injury to the Plaintiff is both "real and immediate," the Court should enter an injunction to preserve the status quo. *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 22, 32 (2008); *Biogen Idec MA Inc. v. Trustees of Columbia Univ.*, 332 F. Supp. 2d 286, 296 (D. Mass. 2004) (quotation omitted).

First, the libelous documents discussed herein remain published on the BMLD's public website and, as such, are readily available to the public and potential employers. The documents therefore continue to harm Dr. Grillo's prospects for employment and to earn a living. For as long as the documents are published, Dr. Grillo will continue to be unjustly denied employment. His professional reputation will continue to be harmed. As such, they are ongoing violations of federal laws, including, but not limited to violations of the Americans with Disabilities Act (*see* Compl. at 18) and Equal Protection (*see* Compl. at 11). Dr. Grillo continues to being treated differently when compared to those physicians who are similarly situated, and without justification. For now, the issuance of a preliminary injunction would hold in abeyance those harms to the Plaintiff and will allow him to resume employment within his profession.

The balance of equities favors the movant

The very real, imminent, and substantial harms that the Plaintiff continues to face as a result of Defendants' unlawful actions outweigh any equities that Defendants may claim support their position. The equities do not favor allowing Defendants to continue their current behavior.

The burdens to the Defendants from a preliminary injunction are minimal. Their actions were unlawful. They elected to use knowingly false information as the framework for their case. This Courts issuance of a Preliminary Injunction may be an embarrassment to the individual Defendants but can only benefit the BMLD by disallowing organized displays of tyranny. They will be on notice that coercive and illegal activities towards Rhode Island's Healthcare Providers may be challenged. A preliminary injunction will provide a strong message to this effect.

A preliminary injunction favors the public interest.

The public interest counsels in favor of an injunction that will prevent Defendants from undermining the carefully crafted constitutional and statutory scheme governing their actions.

Preserving Plaintiffs' rights, and preventing the BMLD from acting unlawfully, clearly serves the public interest. An agency is not harmed by an order prohibiting it from violating the law. *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. 2025); *see Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (it is "always in the public interest to prevent the violation of a party's constitutional rights.") "[T]he public has an important interest in making sure government agencies follow the law.*" Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), aff'd, 463 F.3d 50 (1st Cir. 2006). And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

In summary, the BMLD "cannot suffer harm from an injunction that merely ends an unlawful practice." *Nat'l Insts. of Health*, 2025 WL 702163, at 32 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

<u>This Court should waive the requirement that a bond be posted.</u>

This Court has the discretion to waive the posting of any bond required by Fed. R. Civ. P. 65(b) or to set a token bond. *Crowley v Furniture & Piano Moving, Furniture Store Drivers, etc., Local No. 82*, 679 F.2d 978, 1000 (1st Cir. 1982), rev'd on other grounds, 467 U.S. 526 (1982). In Crowley, the First Circuit identified several important factors for a district court to consider in deciding whether to require a bond: (1) "*at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant*"; (2) "*in order not to restrict a federal right unduly, the impact that a bond requirement would have on enforcement of the right should also be considered. One measure of the impact lies in a comparison of the positions of the applicant and the enjoined party.*" *Id*. The court noted: "*a bond requirement would have a greater adverse effect where the applicant is an individual and the enjoined party an institution that otherwise has some control over the applicant than where both parties are individuals or institutions*."

These factors weigh in favor of waiving any bond in this matter. The plaintiff is an individual who has not worked since August 2024. As a result of the Defendants unlawful acts, the Plaintiff has exhausted his resources.

<u>The formation of the Consent Decree was flawed</u>

By knowingly utilizing false evidence in achieving their summary suspension, the BMLD acted *ultra vires* because they acted outside of their statutory authority. The Defendants knowingly used false facts and false conclusory statements that are contained within the body of the aforementioned documents (*see* Compl. at 41). Their acts, including the publication of the Consent Decree should be deemed invalid and unenforceable.

As to the formation of the Consent Decree (also known as Consent Order), the Rhode Island Supreme Court regards consent decrees, in part, as contractual. A consent decree can be set aside by the court for fraud on the part of one party.

In the instant case, the Parties entered into a consent decree with the goal of amicably resolving this matter without an administrative hearing. Formation requires both parties to be in agreement.

Generally speaking, consent decrees involving the BMLD and healthcare providers do not lend themselves to fair negotiation. Often times, the physician's medical license (and all that it involves) weighs in the balance. The balance of power favors the BMLD. So called "negotiations" are severely limited because the healthcare provider lacks bargaining power. Here there are significant power imbalances. As is the case here, the BMLD dictates take-it-or-leave-it conditions, which requires judicial intervention to protect the weaker party and ensure fairness.

In this case, on August 27, 2024, Attorney Marcaccio submitted a document entitled "Pre-Hearing Memorandum of the Rhode Island Board of Medical Licensure and Discipline."[15] This document set forth the BMLD's agenda for an administrative hearing scheduled for August 28, 2024. An excerpt from this document is as follows:

*"... the Board ... requests that this Hearing Officer revoke his [Grillo's] license indefinitely."*
*(See* Exhibit F at 5, ¶3).

During the pre-hearing meeting of August 27, Defendant Marcaccio, on two occasions, announced to all parties the same – namely the BMLD will be seeking permanent revocation of Dr. Grillo's medical license. Within a few days, suddenly and unexpectantly, Defendant

---

[15] This document was not made public. Prior to the scheduled Administrative Hearing, it was distributed to the involved parties.

Marcaccio informed the Plaintiff through his attorney that the BMLD will be reinstating Dr. Grillo's suspended license (along with an updated/revised Consent Decree).

From the Plaintiff's perspective, his choices were either a) to move forward with the Administrative Hearing and risk an uncertain outcome, or b) have his medical license reinstated which requires that he endorse a new consent decree.

In other words, he would either sign the Consent Decree or risk permanent revocation. From the Plaintiff's perspective, the BMLD's acts amounted to coercion and/or undue influence. Either endorse the terms of reinstatement or else!

<u>In forming the Consent Decree, were there negotiations?</u>

The foundational facts as written in the Consent Decree, and in support of the summary suspension, contain many untruths. Hence, the consent order is built on a foundation of disinformation – one instance and another. In order to have fair negotiations, the BMLD would have to discard the falsities, which would effectively remove the framework and justification for the Consent Decree. It would literally be left bare. As the Defendants continue to aver to this date, there would be no negotiations. Take it or leave it! The Plaintiff eventually realized that he was forced into retirement.

The Consent Decree was procedurally unconscionable because, as discussed, the circumstances of contract formation were fundamentally unfair. In this case, there was clearly unequal bargaining power, lack of meaningful negotiation of the terms, and a lack of meaningful choice.

<u>The Federal Rules of Civil Procedure, Rule 60. Relief from a Judgment or Order</u>

Rule 60(b) of the Federal Rules of Civil Procedure authorizes a court "*to relieve a party from a final judgment, order, or proceeding for specified reasons*." *See* Fed. R. Civ. P. 60. This rule does not limit a court's power to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud on the court.

Furthermore, notwithstanding the Rule's seemingly straightforward language, multiple federal courts of appeals have concluded that Rule 60(c)(1)'s "*reasonable time*" requirement

*does not apply where a party seeks relief from the consequences of an assertedly void judgment* such as in this case.[16] The refusal to apply the reasonable time limitation to motions under Rule 60(b)(4) is premised on the idea that "*no passage of time can transmute a nullity into a binding judgment, and hence there is no time limit for such a motion.*"[17] This view also finds support among leading academic commentators on federal jurisdiction and procedure.[18]

Finally, there is also a catchall provision in Rule 60(b)(6) that permits relief for "any other reason that justifies relief."

<u>Justification for modifying the Plaintiff's medical license from probationary to unencumbered and unrestricted.</u>

<u>A probationary medical license with a ten-year probationary period is unreasonable</u>.

As previously discussed, after eleven years of continuous and documented sobriety, a ten-year probationary period remains unduly burdensome and serves no legitimate purpose. (*See* Compl. at 8, §6). Amongst other things, a probationary medical license stands in the way of becoming credentialed by third-party payors (i.e., insurance companies) and therefore eliminates most employment opportunities. Because probation limits the scope of practice, it also harms those who are in need of a primary care physician. An unencumbered medical license will allow the Plaintiff to provide primary care services to an increased number of Rhode Islanders.

---

[16] *See* Petition for a Writ of Certiorari at 8–11, *Coney Island Auto Parts Unlimited, Inc. v. Burton*, 145 S. Ct. 2775 (2025) (No. 24-808) (mem.) (observing that, *"[a]part from the Sixth Circuit, every Court of Appeals to have addressed the issue has concluded that no . . . time limitation exists*" for a motion under Rule 60(b)(4) and citing decisions from the First, Second, Third, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits as well as the D.C. Circuit).

[17] *United States v. One Toshiba Color Television*, 213 F.3d 147, 157 (3d Cir. 2000) (en banc); *see also, e.g., United States v. Boch Oldsmobile, Inc.*, 909 F.2d 657, 661 (1st Cir. 1990) ("*Even if appellants' motion was not made within the prescribed period, if the judgment was void, relief must be granted nevertheless.*"); *Austin v. Smith*, 312 F.2d 337, 343 (D.C. Cir. 1962) ("Under [Rule 60(b)(4)] . . . , *the only question for the court is whether the judgment is void; if it is, relief from it should be granted. . . . [T]he Rule places no time limit on an attack upon a void judgment . . . .*").

[18] Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure § 2862*, at 431 (3d ed. 2012) ("*[T]here is no time limit on an attack on a judgment as void.*")

<u>The Plaintiff continues to not be treated equally compared to similarly situated individuals.</u>

At the time of his 2020 reinstatement, Dr. Grillo had five years of continuous and documented sobriety. Despite this, his medical license was issued as probationary for a period of ten additional years. This is unusual and prejudicial, because the probationary period for impaired physicians is typically five years. According to the BMLD's public database, all physicians (since 2010), who were similarly situated received five-year periods of probation. Even in the context of criminal law, probationary periods of ten years are unusual.

<u>The BMLD's rationale for imposing a ten-year probation was irrational, arbitrary and capricious.</u>

The factors that went into deciding the length of probation are unknown because the BMLD's meeting on the topic was closed. Clearly, their calculus did not include the scientific evidence. The BMLD's actions were punitive, discriminatory and irrational. They speak to the stigma that the less-informed apply to the medical affliction of alcoholism – even after many years of sobriety.

<u>Medical evidence indicates the Plaintiff is highly likely to remain permanently sober.</u>

There is no evidence (i.e., no medical studies) to support the notion that a person who initially had difficulty in attaining continuous sobriety is at increased risk of relapse after achieving long-term sobriety. The studies to date show that at five years of sobriety; a physician will remain permanently sober in ninety-seven percent of cases. For this reason, both nationally and in Rhode Island, the standard probationary period for physicians with substance use disorder is five years. For reference, since 2010, every physician with substance use disorder who was sanctioned in Rhode Island by the BMLD received a probationary period of five years.

Neither Defendant Fischer, nor the BMLD's board members have professional knowledge of addiction medicine, nor did they base their decision on the available science. Their competency in the subject matter is limited. Their decision was arbitrary and punitive. For them, it was easier to not lift a finger then to assist Dr. Grillo. For no other reason, the BMLD did what they did because they can. Dr. Grillo was invisible to them.

To reiterate, there are multiple studies that demonstrate that the longer one remains sober, the more likely he is to remain permanently sober. Within the scientific community, after six years, sobriety is regarded as being permanent.[19] In other words, there is an evidenced-based argument to be made that Dr. Grillo is no more of a potential risk to the public than any other physician who does not have substance use disorder.[20,21,22.] Given the shortage of primary care physicians in Rhode Island, an unrestricted medical license serves the public by providing the State with one additional primary care doctor who is unencumbered and can practice medicine free of unnecessary restrictions and can care for an increased number of patients.

<u>What were some of the harms suffered by the Plaintiff?</u>

The harms to Dr. Grillo are continuous and will remain so. They are caused by the combined effects of the summary suspension and the two aforementioned documents. The Plaintiff further alleges ongoing violations of multiple federal laws.

<u>Prospective harms</u>

---

[19] Beresford, T., Wongngamnit, N., Temple, B. *Handbook of Clinical Neurology, Chapter 1 - Alcoholism: diagnosis, prognosis, epidemiology, and burden of the disease*, Volume 125, 2014, Pages 3-13, *"... studies note relapse rates as high as 70% in the first year, with a gradual reduction in relapse frequency to the single-digit range after 6 years (Vaillant, 1995)."*

[20] White, W. & Kurtz, E. (2006). *The varieties of recovery experience*. International Journal of Self Help and Self Care, 3(1-2), 21-61. Posted at https://www.chestnut.org/Resources/a13cfc89-7920-43bf-b043-af7078aab8c7/2006-The-Varieties-of-Recovery-Experience-1.pdf

[21] Vaillant GE, Hiller-Sturmhöfel S. *The Natural History of Alcoholism.* Alcohol Health Res World. 1996;20(3):152-161. PMID: 31798117; PMCID: PMC6876506. *"... the stability and durability of addiction recovery increases with length of sobriety, with no relapses in his study among those who had achieved six or more years of continuous sobriety. A growing number of studies are suggesting that the point at which most recoveries from alcohol dependence become fully stabilized is between four and five years of continuous remission*."

[22] Nathan & Skinstad, 1987; De Soto, O'Donnel, & De Soto, 1989; Dawson, 1996; Jin, Rourke, Patterson, Taylor & Grant, 1998). *Persons who achieve full, uninterrupted recovery for five years, like persons who have achieved similar patterns of symptom remission from other primary health disorders, can be described as recovered. In general, this means that the risk of future lifetime relapse has approached the level of addiction risk for persons without a history of prior addiction*."

For as long that the libelous documents are published on the BMLD's website, the documents will continue to cause progressive and prospective harms.[23]

The combined impact of the summary suspension and aforementioned libelous documents continue to cause reputational harms. Dr. Grillo's standing within his community are harmed.

They continue to negatively impact his professional relationships. Opportunities for employment (past, present and future) cease. Dr. Grillo has submitted tens of applications for employment without even a single response. This is direct and proximate result of the aforementioned publications and the summary suspension. Potential employers review the BMLD's website prior to hiring a recruit. None were willing to offer the Plaintiff even an interview. Note that this has occurred in a state in need of primary care physicians. It is reasonably anticipated that, for as long as the libelous documents remain published, Dr. Grillo will remain unemployable.

<u>Additional harms to the Plaintiff</u>

- Business transactions (i.e., Dr. Grillo's medical-legal consulting firm) continue to be ruined, as are his future transactions.
- Reporting a summary suspension to the National Practitioners Database (NPDB) even more harmful to Dr. Grillo's reputation.
- Once suspended, Dr. Grillo immediately lost his income. He continues to have no income.
- Private insurers (payors) are unwilling to credential Dr. Grillo. Malpractice insurers have declined to offer Dr. Grillo malpractice insurance, or if they do, annual premiums increase by approximately twenty-thousand dollars.

---

[23] The combined impact of the summary suspension and aforementioned documents are ruinous. A few of the harms include shame, ridicule, and disgrace. They continue to impact Dr. Grillo's professional relationships. Opportunities for employment (present and future) cease. Needless to say, business transactions (i.e., Dr. Grillo's medical-legal consulting firm) continue to be ruined, as are his future transactions. Dr. Grillo's community standing is harmed.

- Since 2015, Dr. Grillo worked diligently and proactively to rehabilitate his professional and personal reputations. His efforts were successful. The BMLD's actions immediately damaged his reputation.

## CONCLUSION

For all of the foregoing reasons, the Plaintiffs hereby respectfully request that this Court, after hearing thereon, issue a preliminary injunction.

May 30, 2026

Respectfully submitted,

_____

Joseph Grillo, M.D., J.D.
38 Ricci Lane
North Kingstown, Rhode Island 02852
401 406-0012
Jfgrillo1@gmail.com